# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| **BEN THOMPSON** | **CASE NO. 2:16-CV-00208** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **GEO GROUP INC** | **MAGISTRATE JUDGE KAY** |

### <u>TRIAL OPINION</u>

On October 15, 2019, this cause came before the Court as a bench trial, the Honorable Judge James D. Cain, Jr. presiding. The parties have submitted their post-trial briefs as requested and the matter is ripe for decision.

## PARTIES

Plaintiff, Ben Thompson, was an inmate at Allen Correctional Center ("ACC") in Kinder, Louisiana when the incident that is the subject of this lawsuit occurred. During that time, the ACC was being operated by Defendant, the GEO Group, Inc. ("GEO"). Thompson is serving a thirty (30) year sentence for armed robbery.

Thompson was transferred to Elayn Hunt Correctional Facility ("EHCC") on August 24, 2015.

## THE INCIDENT

On February 13, 2015, Thompson was in the auxiliary kitchen of ACC when a Styrofoam ceiling tile fell and struck him in the head/neck area. According to Thompson, the Styrofoam tile weighed just over a pound.

## CLAIMS

Thompson's claimed physical injuries include neck pain, headaches, facial pain, facial numbness, earaches, all over body burning sensation, burning sensations in his feet, urinary problems, burning in his penis, bowel problems, and pain behind his eyes. Thompson is further seeking recovery for his medical expenses that were incurred due to the February 13, 2015 incident.

## WITNESSES

The only live witness at trial was Thompson. Thompson submitted the deposition testimony of Dr. Samer Shamieh, his treating physician; Dr. Shamieh performed a fusion at C6-7 on March 28, 2019. GEO submitted the deposition testimony of Dr. Johnathan Roundtree, the staff physician at EHCC who examined and evaluated Thompson at that facility. GEO also submitted the deposition testimony of Dr. John Noble who GEO retained to perform a review of Thompson's treatment records.

## EXHIBITS

Thompson submitted the following exhibits at trial:

Plaintiff's Exhibit A – Thompson Medical Records from EHCC
Plaintiff's Exhibit B – Thompson Sick Call Form dated 2/13/2015
Plaintiff's Exhibit C – Thompson Medical and Billing records from DISC of Louisiana
Plaintiff's Exhibit D – First Step Response Form
Plaintiff's Exhibit E – Photograph of ceiling tile at ACC
Plaintiff's Exhibit F—Thompson Medical Billings
Plaintiff's Exhibit G—Dr. Samer Shamieh deposition

GEO submitted the following exhibits at trial:

Defendant's Exhibit A – Allen Correctional Administration, Complaint
Defendant's Exhibit B – Medical Records from ACC and EHCC

Defendant's Exhibit C – Dr. Noble's Report
Defendant's Exhibit D – Certification page, Conduct Records, La. Dept. of Corrections, EHCC
Defendant's Exhibit D-1 – 08/30/15 Incident Report
Defendant's Exhibit D-2 – 5/30/2016 Incident Report
Defendant's Exhibit D-3 – 07/11/2016 Incident Report
Defendant's Exhibit D-4 – 12/26/2016 Incident Report
Defendant's Exhibit D-5 – 09/14/2017 Incident Report
Defendant's Exhibit D-6 – 11/11/2017 Incident Report
Defendant's Exhibit D-7 – 05/11/2018 Incident Report
Defendant's Exhibit D-8 – 02/26/2018 Incident Report
Defendant's Exhibit D-9 – 03/22/2018 Incident Report
Defendant's Exhibit D-10 – 05/27/2018 Incident Report
Defendant's Exhibits D-10 and 11 – Drs. John Noble and Jonathan Roundtree deposition

## JOINT STIPULATIONS

GEO has stipulated to liability in this matter, but disputes Thompson's claimed injuries are related to the February 13, 2015 incident.

## ISSUES

Even though GEO has stipulated to liability in this matter, it contends that Thompson was not an appropriate surgical candidate prior to his surgery, and/or that Thompson's complaints which existed at the time of the surgery were not related to the falling tile incident. The primary issues are (1) whether Thompson's complaints, at the time of his cervical surgery performed by Dr. Shamieh in 2018, were caused by the falling tile while at ACC, and (2) whether or not the medical treatment Thompson received while at ACC was reasonable under the circumstances.

# THE TRIAL

*Plaintiff's case-in-chief*

Plaintiff, Ben Thompson, testified at the trial of this matter to the following. Thompson was incarcerated at ACC near the end of April 2012. Tr. p. 4.  On February 13, 2015, two (2) ceiling tiles that were glued together fell and hit Thompson on the back of his neck. Tr. pp. 6-7. Shortly after the incident, Thompson testified that he experienced a severe headache and a fuzzy twinge into his left shoulder blade. Tr. p. 8. Thompson was examined by ACC medical staff shortly after the incident who reported that there was slight redness to the back of Thompson's neck, but no other injuries. Defendant's exhibit B, p. 2. Prior to February 13, 2015, Thompson had not sought medical treatment at the prison for neck pain complaints. Tr. p. 8.

On February 17, 2015, Thompson filled out a "sick call" form and noted that he woke up that morning experiencing severe pain in upper middle back and lower neck. Defendant's exhibit A, p. 14.  "I can't turn my head to my left." Tr. p. 10, lns. 15-17. Thompson reported to the medical staff that he was having shocking pains and stabbing pains in his back and shoulder blade. Tr. p. 11. Thompson testified that he had experienced left ear problems since he was 12 years old when he ruptured his left eardrum after being hit by a baseball bat. Id.

Thompson testified that he continued to seek medical treatment at ACC which included ibuprofen or Tylenol as well as a CAT scan. Tr. pp. 12-13. Thompson continued to experience symptoms of neck pain after he was transported to EHCC. Tr. p. 14.

Thompson further complained of weakness, dizzy spells, and persistent stabbing pains between the edge of his spine to his shoulder blade. Id.

At EHCC, Thompson was treated with physical therapy which he states caused him to "jump[] off the table." Tr. p. 15, ln. 7. Thompson also received one injection from Dr. Comeaux which he testified made his condition worse. Id. Around May of 2017, Thompson had an MRI scan of his neck. Tr. p. 16. Thompson's attorney referred him to Dr. Shamieh who reviewed his MRI scan and examined him. Tr. p. 17. At the recommendation of Dr. Shamieh, Thompson underwent a spinal fusion of C6 and C7. Id. Thompson testified that the surgery fixed the pain and gave him better range of motion, but the he still experiences a popping sensation in his neck. Tr. pp. 18, 20.

Thompson testified that after the falling tile incident, he picked up an ice chest and experienced a popping in his neck in the same location in which the tile fell. Tr. p. 20. He also testified that he repeatedly fell out of his bunk. Tr. p. 21., lns.1-5.

*Defendant's rebuttal*

On rebuttal, Thompson testified that he was serving a 25 plus 5-year term of imprisonment for armed robbery. Tr. p. 22. Defense counsel pointed out that in his September 28, 2016 deposition, Thompson testified that he was serving 35 years. Thompson denied this twice, and ultimately stated he may have mis-spoke due to nervousness. Tr. pp. 22-23.

Thompson testified that the tile that hit him was not foam. Tr. p. 25. Defense counsel pointed out that in his deposition, Thompson had previously testified that the tile was foam. Thompson adamantly denied that he testified in deposition that the tile was foam. Id. When

shown his deposition testimony regarding the foam tile, Thompson again denied having testified that the tile was foam and further indicated that the Court Reporter had "got it wrong." Tr. pp. 25-27.

When questioned, Thompson testified that he had received an x-ray which was performed on March 11, 2015. Tr. p. 29. The x-ray revealed no compression fracture, and mild degenerative changes at C5-C6. Defendant's exhibit B, p. 15. Also, in March of 2015, Thompson was initially given Naproxen (500 milligrams) but because of continued complaints of pain, he was given Naproxen (550 milligrams). Tr. pp. 29-30. Thompson testified he complained to the medical staff that the blue pill which was a stronger dose of Naproxen (550 milligrams) did not work, so he requested that the medical staff give him the white pill (500 milligrams of Naproxen). Id. Defendant's exhibit A, pp. 30-31.

Thompson testified that he was found intoxicated in prison from smoking synthetic marijuana. Tr. p. 31. Thompson denied using the Naproxen to make synthetic marijuana. Id. The medical staff at ACC also gave Baclofen but they stopped giving it to him noting that he had been abusing it. Tr. pp. 31-32. Thompson testified that the Baclofen did not help. Id. Defense counsel pointed out to Thompson that in his deposition, he testified that he was doing great with the Baclofen with the muscles in his neck. Id.

Thompson testified that when he was transferred to EHCC, he refused to work in the field because of the pain. Tr. p. 34. He further testified that he continued to have stabbing sensations along his spine and shoulder blades, he could not turn his head to the left, and he experienced a "severe like that ice pick in the ear." Tr. p. 35, lns. 10-12. Thompson also complained of left arm numbness. Tr. pp. 35-36.

Defense counsel asked Thompson if he had ever threatened the medical personnel to which he responded that he "wouldn't say [he] threatened the medical personnel." Tr. p. 37, lns. 6-8. Defense counsel also asked about other accidents he was involved in after the February 2015 accident. Thompson testified that in September 2015, shortly after arriving at EHCC, he injured himself picking up an ice chest causing shooting pains into his head, ears and back of his eyes. Tr. pp. 39-40. Thompson denied that the pain was related to picking up the ice chest. Tr. pp. 40-41. Thompson testified that in November 2015, he stepped in a drain hole that was missing the cover causing him to fall and hit his head. Tr. p. 38.

Thompson was questioned about the complaints he made to an intern who was taking notes; the notes indicated nothing of significance and stated that there were no positive findings of anything neurologic that could objectively say was related to Thompson's neck, other than Thompson's own complaints. Tr. pp. 42-43. Thompson denied this and testified that the intern was in total agreement with him as to his experiences. Id. The medical records state otherwise. Defendant's exhibit B, P. 143, Doc. 59-2.

The medical records reveal that on 4/22/2016, Thompson has "no evidence of denervation. There is no evidence of chronic reinnervation." Id. pp. 101-102, 59-2. The Neurodiagnostic study showed that "[t]here is no electrophysiological evidence of a right upper extremity radiculopathy." Id. p. 102.

The medical records note that Thompson would become defensive and belligerent when he was informed by medical staff that his complaints were muscular versus

neurological, and he would accuse the medical staff of incompetence. Id. p. 84. The medical records note that on 12/26/2016, Thompson threatened to punch a doctor in the face, and the medical staff was unable to obtain vitals due to Thompson's boisterous behavior. Id. p. 127.

Thompson testified about an incident at EHCC involving a person pushing a laundry cart. Thompson abruptly stopped and his foot slipped on the cement causing his neck to pop several times. Tr. p. 44. Thompson subsequently fell down and experienced blurry vision. Id. Thompson complained that both of his legs went numb which resulted in him spending two weeks in a wheelchair. Id. Thompson testified that this incident, as well as the ice chest incident, and the fall caused by the opened drain occurred before he had an MRI scan on his neck. Tr. p. 45. Thompson also testified that he had several incidents where he lost his balance and fell out of his bunk at the EHCC. Tr. p. 46. Thompson further testified that he had fallen out of bed at ACC. Even though defense counsel noted that the records from ACC failed to indicate any of the alleged falls, Thompson insisted that he had made sick calls when he had fallen out of the bunk. Tr. pp. 47-48. Thompson suggested that there was a conspiracy going on against him to keep his records differently. Id.

Thompson testified that his first and only visit with the physical therapist did not go well; he stated that he almost hit the therapist for moving his head to the left. Tr. p. 49. The therapist noted that Thompson was "poorly invested in participation and was only focused on psychosocial gains. Defendant's exhibit B, p. 84. Thomas stated that the therapist was out to get him, and she was the worst one. Tr. p. 50.

Thompson testified in his deposition that after the tile hit his neck, his speech would get hung up causing him to stutter; defense counsel noted that the sick calls did not reveal this complaint, nor did the medical records. Tr. pp. 50-51. Again, Thompson insisted that he told the medical staff about his speech impediment and wrote it down on the sick call forms. Tr. pp. 51-52. Thompson testified that the medical staff's comments that he was moving and/or walking normally was "a line of bull." Tr. p. 53. On May 30, 2016, Thompson's sick call form indicates that he is having problems with his speech and tremendous pain in his neck, head, left ear, under his left shoulder blade, and left arm to wrist. Tr. p. 85.

Defense counsel reported to Thompson that the doctor who administered the injection had noted that he had observed Thompson jump out of the van without any indication or signs of pain. Tr. p. 54. The doctor noted that when he examined Thompson's neck, he acted as if he were in extreme pain which the doctor believed was inconsistent with his earlier observation. Id. Again, Thompson testified that the doctor's observation and comments were a "line of bull." Id. Thompson testified that all of them were "in cahoots together." Id.

In April 2016, Thompson underwent a nerve conduction study of his right arm. Tr. p. 55. Thompson testified that he told the examiner that the study was supposed to be on the left arm. Id. Defense counsel read the notes dated April 20, 2016, which stated that the patient (Thompson) said that he had been experiencing neck pain which radiates behind the eyes and sometimes into the right arms, and that the symptoms started after the neck

trauma last year. Id. Thompson denied that he told the examiner that it was his right arm. Id.

Defense counsel questioned Thompson about his anger outburst when he threatened to punch the doctor in the face and medical staff was unable to take his vitals. Tr. p.59. Thompson responded that, "[i]t's a constant battle when you go up there. They constantly doing kind of like what you're doing today trying to get me to say something out of line or say something that can backfire on me. It's constant." Tr. p.61, lns. 8-12. Thompson denied that he threatened to punch the doctor in the face. Id. The medical staff further noted that Thompson ambulates with minor difficulty and shows no signs of acute distress; Thompson is boisterous, talkative and agitated. Defendant's exhibit B, p. 84. Thompson denied that he was agitated. Tr. p. 62.

Thompson testified that he has a stint in his pulmonary artery from a gunshot wound, but that did not cause him to get dizzy. Id. He also was shot in the face and still has bullet fragments in his face, but this only causes him pain when he was shaving. Tr. pp. 62-63. Thompson testified that he had been hit with a slap jack at a nightclub which required reconstructive surgery. Id. Thompson denied that he had been treated for neck pain after the incident. Tr. p. 86. Thompson also testified that "they told me that there was nothing wrong with my eardrum. . . ." Tr. p. 64, lns. 16-17.

Thompson testified that he got stabbed more than once in fights at EHCC. Tr. p. 65. Thompson was involved in a fight on February 5, 2018 when he was stabbed in the cheek and stabbed three (3) time in the chest. Id. Thompson testified that there was a bunch of stuff hurting after that. Tr. p. 66, ln. 8.

Defense counsel asked Thompson if he had fallen out of his bed prior to the ceiling tile incident to which he responded, "he could not recall." Tr. p. 70, lns. 22-25, Tr. p. 71, lns. 1-2. Defense counsel then showed Thompson exhibit A (p. 60) dated February 23, 2012, wherein Thompson reported that he had fallen out of the top bunk and was complaining about an earache. Tr. p. 71. Thompson testified that he did not recall this event happening, and that the report was for someone else because he had never been designated a top bunk.

Id.

Defense counsel showed Thompson a note dated April 30, 2012, which revealed that on that date, ACC limited Thompson to a lower bunk. Tr. p. 72. Defense counsel asked Thompson why he had been restricted to a bottom bunk and if he had experienced falling out of the top bunk, to which Thompson replied that he did not know, and he did not recall having a bottom bunk status at ACC. Id.

Thompson testified that he had been involved in a fight on August 30, 2015, at EHCC. Tr. p. 73. On May 30, 2016, the records indicate that Thompson punched a window or glass causing it to shatter. Tr. p.74. Thompson denied that he punched the window, but merely tapped it. Id. On July 11, 2016, Thompson was involved in a physical altercation with another inmate at EHCC. Id. When asked if the altercation injured his neck, Thompson responded that "[i]t sure did not make it feel good." Tr. p. 75.

When defense counsel questioned Thompson about his threats towards medical staff that were recorded in the medical records, Thompson responded, "I've never threatened the medical staff." Tr. p. 77, lns. 1-4. On September 14, 2007, Thompson was involved in

a fight with an elderly man at the pill call window. Tr. p. 77. Thompson testified that the man punched him in the forehead. Id. When asked if it hurt his neck, Thompson responded that it "[s]ure didn't make it feel good." Tr. p.78, lns. 6. On May 11, 2018, Thompson threatened one of the officers telling him he would "get him in the world." Tr. p. 78, ln. 21.

On February 26, 2018, before his surgery, Thompson was found in his cell intoxicated from synthetic marijuana. Tr. p. 81. Thompson denied using any of his pills to produce synthetic marijuana. Id. On March 22, 2018, Thompson was reported as intoxicated. Tr. p. 82. Thompson denied being intoxicated. Id. On May 28, 2018, after his surgery, Thompson was reported as sitting in a wheelchair throwing up, hollering, and swinging his arms. Id.

In addition to the exhibits introduced at trial, the Court admitted into evidence the deposition transcripts of Dr. Samer Shamieh, Plaintiff's exhibit G, and Dr. John Noble, Jr. and Dr. Jonathan Roundtree, Defendant's exhibits D-10 and D-11 (Rec. 70).

*Dr. Shamieh*

On March 29, 2018, Dr. Shamieh performed a fusion of C6-C7 on Thompson. Plaintiff's exhibit G, p. 5. Dr. Shamieh had previously reviewed Thompson's records, the MRI dated February 3, 2017, and examined Thompson on one occasion. Id. p. 6. Based on the medical records and what Thompson told him, Dr. Shamieh opines that his treatment and surgery are causally related to the February 13, 2015 incident. Id. p. 8. Dr. Shamieh testified that the MRI would not show when the pathology seen there would have occurred. Id. p. 9, lns. 11-16. Dr. Shamieh remarked that the MRI was taken two (2) years after the incident. Id. p. 8, lns. 1-4.

Dr. Shamieh testified that one could possibly herniate a cervical disc by picking up something heavy (referring to when Thompson picked up the ice chest on September 8, 2015), Id. p. 13, however, he also stated that Thompson could have exacerbated symptoms that were already present. Id. p. 14. Dr. Shamieh noted that he could not make an objective finding, Id. pp. 14-15, and that Thompson's medical records did not reveal complaints of neck pain prior to the February 13, 2015 incident. Id. p. 22.

Dr. Shamieh opined that more probably than not, Thompson's symptomatology and the need for surgery were causally related to the February 2015 incident. Id. p. 23.

*Dr. Noble*

Dr. Noble was retained by the GEO. Dr. Noble did not examine Thompson but reviewed the medical records and the MRI report. Dr. Noble reported to defense counsel[1] that "it would be very difficult to opine exactly what necessitated the need for surgery. Because his complaints were not classic I cannot with a greater than fifty percent of probability state that the ceiling tile caused the need for surgery." Defendant's exhibit D-10, p. 2, Doc. 70-1.

Dr. Noble reviewed the CT scan of Thompson's neck performed 3/11/2015, and testified that he agreed with Dr. Rountree's impressions of the CT scan that it showed "nothing that appeared to be acute." Id. pp. 11-12.

Dr. Noble testified that Thompson's complaints of constant shooting pains into both ears and all over the head were not usual complaints for an injury to the neck and cervical

---

[1] Letter dated September 4, 2019. Doc. 70-1.

spine. Id., pp. 15-16. Specifically, Dr. Noble testified that he had "never heard anybody have shooting pain behind their eyes related to their cervical spine." Id. p. 17, lns. 11-13. Dr. Noble also testified that the symptoms Thompson experienced when he picked up the ice chest "could be a new injury," noting again that Thompson's complaint were not a "classic description for radiculopathy." Id. p. 18, lns. 4, 10-11.

Dr. Noble reviewed the notes made by Dr. Barkemeyer and his intern on 9/30/15 and testified that the notes indicated that on that day, Thompson had a normal neurologic exam with no radicular symptoms. Id. p. 19. Dr. Noble further opined that Thompson's complaints over a two-year span after the September 13, 2015 incident were "definitely extreme on the spectrum." Id. p. 25, ln.5. Regarding Thompson's complaints of pains to his rectum and abdomen, Dr. Noble testified that "it would be extremely rare for him to have these sort of symptoms, that would only be seen in severe spinal cord compression." Id. p. 26, lns. 21-24.

On 4/22/16, Thompson presented himself to have a nerve conduction study performed due to Thompson's complaints for "right-sided pain" and/or pain in his right arm. Id. p. 32, ln. 24; p. 33, ln. 3. The new conduction study found no problems with his right side. At trial, Thompson testified that the examiner mistakenly performed the study on his right side. Tr. p. 55. Dr. Noble testified that a review of Thompson's medical records did not mention "anything specifically about left extremity radiculopathy." Noble depo. Doc. 70, p. 33, lns. 24-25.

Dr. Barkemeyer and an intern examined Thompson on 3/22/2017, and noted that the "[n]eurologic examination without deficit, without signs of radicular, myelopathy,

neuropathy, etc." Dr. Noble testified that based on the exam performed by Dr. Barkemeyer, the neurologist did not find anything he could "correlate on a physical exam to a disc issue." Id. p. 42, lns. 1-25. Dr. Nobles testified that based on Thompson's medical records both Dr. Roundtree and Dr. Barkemeyer had both recommended that Thompson should not have surgery based on his complaints and the records. Id. pp. 48-49.

Dr. Noble testified that considering Thompson's deposition testimony that he experienced left arm pain and numbness, Dr. Noble could not make a determination one way or the other whether the ceiling tile incident caused the disc herniation, the radiculopathy, and the need for surgery. Id. p. 81. However, Dr. Noble testified that based on all of the evidence he could not say that it was more likely than not, that Thompson's physical problems in 2018 at the time of the surgery were solely related to the ceiling tile incident of 2015. Id. p. 89.

*Dr. Jonathan Roundtree*

Dr. Roundtree is a staff physician for EHCC and treated Thompson on multiple occasions after Thompson's transfer from ACC. Defendant's exhibit D-11, Johnathan Roundtree deposition, pp. 6, 10-11, Doc. 70-2. Dr. Roundtree testified as to the medical records and explained for the Court each medical visit Thompson made, along with his complaints, the diagnosis, and treatment.

Dr. Roundtree testified that on 2/26/15, it was noted that during the exam, there was no radiating pain, only localized pain in his neck. Id. p. 27, lns. 23-25.

Dr. Roundtree reviewed the results of the X-ray performed on Thompson on 3/3/2015. Dr. Roundtree testified that the Radiologist report revealed "No compression

fracture. Mild degenerative changes at C5 and C6." Id. p. 28, lns. 7-8 Dr. Roundtree explained that this was not out of the ordinary for a 36-year-old, and that "everybody can get mild degenerative changes, usually starting in their 30s and mid-30s. Id. p. 28, lns.19-23.

Dr. Roundtree testified about the CT scan of Thompson's cervical spine performed 3/11/2015. Defendant's exhibit B, p. 23. He explained that the scan did not "look acute to me. It looks more of a chronic nature." Defendant's exhibit D-11, Roundtree depo. p. 35, lns. 14-16. He further testified that the scan did not reveal an acute injury from the ceiling tile. Id. lns. 20-22.

On 3/12/2015, Thompson presented himself to the medical staff. Dr. Roundtree testified that the notes for the visit indicated that Thompson had been overusing Naproxen and was put on Baclofen. Id. p. 36, ln 6. On 3/20/15 Thompson made a sick call; the notes indicate that he had a "[f]ull range of motion without deformity." Id. p. 39, ln. 16. On 4/24/2015, Thompson made a sick call; the notes indicate that he was assessed with cervical radiculopathy and was treated with Robaxin.

In August 2015, Thompson was transferred to EHCC. On 9/30/2015, Thompson was examined by a neurologic resident and Dr. Barkemeyer. The examination revealed no cervical radiculopathy or myelopathy. Id. p. 85, lns. 15-18. On 9/20/2017, Dr. Barkemeyer examined Thompson. In his notes, it appears that Dr. Barkemeyer had read Dr. Shamieh's recommendation for surgery. He notes, "History of cervical pain without signs of cervical radiculopathy and myelopathy. Regarding radiologist's recommendation, it appears to be propping up a radiological diagnosis as a medical diagnosis, therefore, made a

recommendation for surgery without a medical diagnosis. Very dangerous. Neurologic clinic in six months." Id. p. 137, lns. 12-18.  Dr. Roundtree opined that Thompson was not a surgical candidate. Id. p. 142, lns.19-24; p. 149, lns. 7-9. He further opined that at the time of the surgery (March of 2018), Thompson's complaints were not caused by the tile falling tiles in February of 2015. Id. pp. 150-151.  Dr. Roundtree opined that Thompson's complaints were probably from previous arthritic problems, and the falling tile may have aggravated the situation. Id.

Dr. Roundtree testified that he believed that Thompson exaggerated about his symptoms. Id. He also testified that Thompson's complaints were likely related to the accidents, and/or incidents he was involved in that were closer to the time of his surgery. Id. p. 152.

*The Court's Findings*

I must decide if the cervical surgery performed by Dr. Shamieh in 2018 was caused by the tile which fell and hit Thompson on February 13, 2015. I must also decide if the medical treatment at ACC regarding this incident was reasonable.

Thompson bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury by a preponderance of the evidence. *American Motorist Ins. Co. v. American Rent-All, Inc.,*579 So.2d 429 (La. 1991). The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.  *Mart v. Hill*, 505 So.2d 1120 (La. 1987).

First, I find that Thompson failed to introduce sufficient evidence at trial to support his Eighth Amendment claim under Section 1983.  Thompson did not present evidence to establish that it is the official policy or custom of the ACC which lead to the claimed deprivation.  Accordingly, Thompson's Eighth Amendment claim under section 1983 will be dismissed with prejudice.

Next, I find Thompson has failed to prove, by a preponderance of the evidence, that the tile incident on February 13, 2015, caused him to suffer from the numerous injuries he complained of, and more significantly, the C6-C7 fusion performed by Dr. Shamieh. In other words, Thompson has failed to prove, more likely than not, that the tile incident on February 13, 2015, was related to his need for the March 2018 cervical surgery.

Thompson argues that because he had no neck complaints prior to the tile incident, he is entitled to a presumption as described in *Housley v. Cerise,* 579 So.2d (La. 1991). The *Housley* presumption was first articulated by the Louisiana Supreme Court in *Lukas v. Ins. Co. of North America*, 342 So.2d 591 (La.1977) as follows:

> A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

*Housley,* 579 So.2d at 980. The three *Housley* factors are: (1) the plaintiff was in good health prior to the accident at issue; (2) subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterwards, and (3) evidence

shows a reasonable possibility of a causal connection between the accident and disabling condition. Id.

There is no dispute that Thompson had no documented complaints of neck pain prior to the tile incident but did make complaints afterwards. However, as explained below, I cannot find that the cervical surgery was caused by a one-and-one-half pound tile that fell on his neck. In other words, the Defendant has overcome the presumption; therefore, Thompson is not entitled to a presumption of causation.

Even though Dr. Shamieh relates the tile incident to the surgery based on one exam of Thompson and an MRI taken two (2) years after the incident, Dr. Shamieh also relied on Thompson's subjective complaints which this Court finds were not credible.

I find that Thompson was not a credible witness and overexaggerated his symptoms. For instance, Thompson made numerous complaints of pain to his head, eyes, ears, neck legs, feet, and rectum. There were several notations in the medical records which indicated that while Thompson was making many of these complaints, he was observed by medical staff who noted that he was able to ambulate and/or jump out of a van without exhibiting the pain that he subjectively complained about to the medical staff. The medical records also indicated that he was non-compliant and/or refused to participate during medical exams and physical therapy.

I further find that Thompson was involved in an inordinate amount of altercations and other incidents between February 13, 2015, and when the surgery was performed on March 28, 2018. Some of these altercations involved fights with up to six (6) inmates to

which Thompson testified, he was the victor. Thompson also fell on numerous occasions after the tile incident and before the cervical surgery and/or the MRI was performed.

I also give greater weight to the deposition testimony of Dr. Roundtree, the physician who examined Thompson on several occasions, read the MRI report, and explained to the Court the medical records. Dr. Roundtree did not believe that Thompson was a candidate for the surgery based on the medical records, x-ray, CT scan, and the MRI report. Dr. Roundtree's opinion that Thompson was not a surgical candidate is also buttressed by Dr. Barkemeyer's notes, a neurologist who also examined Thompson. Furthermore, Dr. Roundtree could not relate the tile incident to the cervical surgery.

Finally, I give little to no weight to Thompson's testimony which was replete with inconsistencies from his prior deposition testimony and the medical records. False testimony is always a relevant credibility factor. *Turner v. Cleveland Tr. Co.,* 686 So.2d 871, 879-80, *writ denied,* 679 So.2d 1350. (La. 1996). Thompson appeared to blame everyone but himself for these inconsistencies. According to Thompson, even the Court Reporter who transcribed his deposition testimony was a liar.

Even though I find that the tile incident is not related to the cervical surgery, I also find that Thompson has proved that the tile incident injured his neck and that he suffered pain because of that injury.

## CONCLUSION

For the reasons stated above, I find that Thompson has failed to prove by a preponderance of the evidence that the Defendant did not provide reasonable medical treatment for the tile incident. I further find that Thompson has failed to prove the cervical

surgery was related to the tile incident, but Thompson has proven that he suffered an injury caused by the tile falling on his neck. For this injury, I will render judgment in his favor and against The GEO Group, Inc. in a total amount of $15,000 for pain and suffering.

**THUS DONE AND SIGNED** in Chambers on this 14th day of November, 2019.

JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE